IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHRIS LOGAN,

        Plaintiff,

      v.

CITY OF CHICAGO, *et al.*,

        Defendants.

Case No. 17 C 8312

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Defendant City of Chicago ("City") and Defendants Jeffrey Redding, Robert May, Anthony Bates, David Schmidt, and Jorge Rodriguez bring Motions for Summary Judgment. For the reasons stated herein, the Court grants both the City's Motion (Dkt. No. 62) and the individual Defendants' Motion (Dkt. No. 64).

## I.  BACKGROUND

Plaintiff Chris Logan ("Logan") was an Aviation Security Officer ("ASO") with the City of Chicago's Department of Aviation, Security, and Safety Division ("CDA"). (Pl.'s Resp. to Defs.' Stmt. of Material Facts, "PSOF" ¶ 1, Dkt. No. 78.) In 2015, Logan interviewed for a vacant Aviation Security Sergeant position. (PSOF ¶ 54.) He did not obtain the promotion, but he earned a spot on a "Pre-Qualified Candidates" list ("PQC list") and could be promoted to fill

future vacancies. (*Id.*) As of March 2017, when two vacancies arose, Logan was second on the PQC list. (*Id.* ¶¶ 55–57.) He completed paperwork to fill one of the spots, but the City rejected him because his disciplinary history made him ineligible for a promotion. (*Id.* ¶ 57.) Instead, the City promoted two other candidates, including a white woman. Logan identifies as an African American man. (*Id.* ¶ 1.) At the time, City policy was that any internal candidate for a promotion could not have been suspended more than seven days in the previous 12 months. (*Id.* ¶ 78.) During that period, Logan had been suspended for 14 days. (*Id.* ¶¶ 58 & 65.)

Logan does not challenge the City's promotion policy, but he alleges that the disciplinary incidents that led to the 14-day suspension were the result of race and gender discrimination and retaliation. He seeks compensatory damages and other equitable relief. Logan alleges the individual Defendants created false claims against him and improperly conducted an investigation into his behavior. According to Logan, his supervisors began targeting him after he confronted a supervisor about sexually harassing his girlfriend. Following the confrontation, Logan was disciplined five times, and those infractions form the basis of his Complaint. The facts surrounding the confrontation,

the disciplinary actions, and the aftermath, are undisputed unless otherwise noted.

Sometime between February 29, 2016, and April 4, 2016, Audrey Diamond ("Diamond"), then dating Logan, said she met Defendant Jeffrey Redding ("Redding") during her work at United States Customs and Border Protection. (*Id.* ¶ 15.) At the time, Redding was a CDA Deputy Commissioner. (*Id.* ¶ 14.) Diamond testified that she told Logan that Redding "seems like a really nice guy" and that they had "talked about a badge holder." (Diamond Dep. at 10:7-10, Ex. L to Defs.' Stmt. of Material Facts ("DSOF"), Dkt. No. 66-13.) According to Diamond, Logan told Diamond to stay away from Redding and said that he would also tell Redding to stay away from Diamond. (*Id.* at 12:19-24, 13:1-3.) Diamond claims that she never told Logan that Redding acted inappropriately or that Redding was offensive, flirtatious, or unprofessional. (PSOF ¶ 17.) Logan testified to the opposite: he claimed that Diamond told him that Redding was coming to her office and being flirtatious, that these advances were unwanted, and that Redding was making Diamond uncomfortable. (*Id.* ¶ 18.) Logan visited Redding's office to discuss Diamond. (*Id.* ¶ 20.) Redding testified that "[Logan] came into the office and said so I heard you met my girlfriend or something like

that" and that the meeting was brief. (Redding Dep. at 44:12–24, 45:1–24, Ex. G to DSOF, Dkt. No. 66-8.) Logan testified that he told Redding that "this is pretty much, you know, regarding a personal matter," that the "young lady that works down in the ID badging office, well, that's my girlfriend. And I'm just letting you know." (Logan Dep. at 65:5–20, Ex. A to DSOF, Dkt. No. 66-2.) Logan testified he talked to Redding about Diamond because "[Redding was] making her feel uncomfortable, and [Redding] being new here [he] probably didn't know that." (*Id.* at 65:18–23.)

Out of "guy code," Logan testified, he had wanted to let Redding know that Logan was "dating the young lady," and wanted to ensure Redding did not "cross that line." He described the meeting as "informative," and said it lasted five or ten minutes. (*Id.* at 65:22–23, 66:1–10, 68:2–8.) Redding testified that on April 4, 2016, he received a text message from Defendant Robert May ("May"), CDA's Director of Administration, that read: "I was in the terminals yesterday for the SEIU walkout and overheard an officer talking about how Chris Logan had to let his new boss know to leave his woman alone. I fell out laughing;" Redding responded: "Wow. LOL okay." (Redding Dep. at 40:2–23.)

Logan alleges that his supervisors acted unlawfully in handling the five disciplinary incidents that followed this conversation. The first occurred on May 24, 2016, when Logan went to the Travelers Aid office in O'Hare International Airport ("O'Hare") and spoke to Eiffel Yap about the organization's failure to staff an information desk in the international terminal. (PSOF ¶ 22.) Afterward, the Travelers Aid office complained to Redding about the interaction, and Redding testified that he was told that Logan was "upset and confrontational" during the incident, and that Travelers Aid staff was "shaken up." (*Id.* ¶ 23.) On June 18, 2016, Logan received a notice of a pre-disciplinary hearing for violations including discourteous treatment of a member of the public. (*Id.* ¶ 24.) After the hearing, Defendant Anthony Bates, an administrative lieutenant, reviewed the materials with Redding, and recommended discipline between a written reprimand and a three-day suspension; Redding decided Logan should receive a one-day suspension. (*Id.* ¶ 25.) Logan received his one-day suspension on July 8, 2016. *(Id.* ¶ 26.)

Next, on July 12, 2016, Logan called Airserv Transportation Manager Mark Anderson ("Anderson"), attempting to recover a lost cell phone for an airline employee. (*Id.* ¶ 27.) The following day, Airserv's general manager emailed

Redding and complained that during Logan's call to Anderson, Logan threatened to deactivate Anderson's security badge unless the cell phone was returned by a certain time. (*Id.* ¶ 28.) As a result, on July 18, 2016, Logan received another notice of a pre-disciplinary hearing for rule violations including discourteous treatment of a member of the public and improper use of authority by security personnel. (*Id.* ¶ 29.)

The next three incidents allegedly involved Logan breaching security protocol or misrepresenting the time he worked. ASOs like Logan are responsible for securing and controlling airfield access at Chicago's two major airports, including O'Hare. (*Id.* ¶ 8.) They work fixed posts and are not allowed to leave their post until another officer relieves them face-to-face. (*Id.*) ASOs record their work hours by "swiping" in and out using a hand measurement device at an assigned "home clock" called the "Kronos system." (*Id.* ¶ 9.) If the Kronos system malfunctions or if there is some other failure in time registration, employees must provide documentation to account for their work hours. (*Id.*) To avoid payroll issues, Defendant David Schmidt ("Schmidt"), a CDA lieutenant, regularly reviewed time records for the ASOs on his watch to ensure each officer registered a swipe time at

the start and end of the shift. (*Id.* ¶ 10.) If there was a
swipe failure, Schmidt usually first confirmed an officer's
attendance by referring to the times the officer used an
airport badge to enter O'Hare's secure doors. Failing that,
he reviewed video footage if it was available, but testified
that "I would call that the last resort." (Schmidt Dep. at
40:18–41:8, Ex. D to DSOF, Dkt. No. 66-5.)

On July 7, 2016, Schmidt noticed Logan had no time swipes
for the previous day. (PSOF ¶ 30.) He reviewed Logan's airport
badge swipes and found Logan had swiped into CDA's Safety and
Security Division offices at 9:07 p.m., about an hour before
the 10:00 p.m. scheduled end of Logan's shift. (*Id.* ¶ 30.)
Schmidt reviewed video footage and saw that Logan had entered
the offices dressed in shorts and flip-flops, sat at the front
desk, and left through the building's back door at around
9:25 p.m. (*Id.* ¶ 31.) On July 8, 2016, Logan signed an edit
sheet representing he had worked until 10:00 p.m. on July 6.
(*Id.* ¶ 32.) Redding was notified, and asked Schmidt to review
the records of his entire watch to find if any other officers
engaged in similar conduct. (*Id.* ¶ 33.) Redding also asked
Defendant Jorge Rodriguez ("Rodriguez"), an Aviation Security
Sergeant at CDA, to review camera footage for certain days
when Logan worked two other ASO positions. (*Id.* ¶ 34.) Upon

this review, Rodriguez and Schmidt discovered two other instances when Logan left his post or misrepresented his work hours on edit sheets. (*Id.* ¶ 35.)

On June 17, 2016, Logan worked Post 1, on the northwest side of the O'Hare airfield. (*Id.* ¶ 36.) Time records indicate that Logan swiped out at 9:53 p.m. at Post 11, near the international terminal, which is at least a 10- to 15-minute drive from Post 1. (*Id.* ¶ 36.) Defendants claim that in order to swipe out at that post and at that time, Logan could have left his post no later than 9:43 p.m. (*Id.* ¶ 37.) Further, Defendants claim that Logan could not have been relieved face-to-face by another ASO as of 9:43, because the relieving officers would have been in roll call at 9:30 p.m. in a building that is at least a ten-minute drive from Post 1. (*Id.* ¶ 37.) From this data, Redding concluded that Logan committed a security breach by abandoning his post. (*Id.* ¶ 37.)

The next incident occurred the following day, on June 18, 2016. Video footage captured Logan entering the 850 building in uniform at 7:50 p.m. and leaving at 8:02 p.m. dressed in civilian clothes. (*Id.* ¶ 38.) Logan claimed he obtained permission from a supervisor to leave work early. (*Id.* ¶ 39.) Defendants claim the supervising sergeant

reported to Schmidt that Logan had only inquired about leaving work early and that the sergeant instructed Logan to submit the appropriate form to account for the time; Defendants further claim that Logan told the sergeant he would "get back" to him but did not. (*Id.* ¶ 39.) Logan disputes this characterization and claims there is no admissible evidence in the record supporting what the supervising sergeant said. (*Id.*) The parties do not dispute, however, that Logan signed an edit sheet representing that he had worked until 10:00 p.m. on June 18, 2016. (*Id.* ¶ 40.)

On July 18, 2016, Rodriguez served Logan a notice of a pre-disciplinary meeting regarding the rule violations on June 17, June 18, and July 6, and to address the July 12, 2016, Airserv incident. (*Id.* ¶ 41.) Schmidt conducted the pre-disciplinary meeting on July 21, 2016. (*Id.* ¶ 42.) Rodriguez and Redding attended the meeting; Logan's union representatives objected to Redding's presence, but Redding's supervisor, Lydia Beairsto ("Beairsto"), gave Redding permission to attend the meeting. (*Id.* ¶ 43.) Defendants claim that Beairsto's permission came with the understanding that she would decide on the necessary discipline, not Redding. (*Id.* ¶ 43.) Logan does not dispute that Beairsto stated that she would decide the discipline, but he claims

that May and Redding actually decided the discipline. (*Id.* ¶ 43.)

Schmidt assembled information relevant to the charges and sent the material to Bates, who forwarded the material to Redding, who reviewed the report and submitted it to May, in CDA's Human Resources ("HR") Division. (*Id.* ¶¶ 44–45.) On September 9, 2016, May recommended to Redding that Logan be suspended between ten and 15 days. (*Id.* ¶ 46.) Redding decided on a 14-day suspension. (*Id.*) Logan served the suspension between September 21, 2016, and October 5, 2016, and Rodriguez, Schmidt, and Bates were not consulted about the suspension imposed. (*Id.* ¶¶ 47–48.)

When Logan returned to work on October 6, 2016, he informed the CDA's Director of Administration, Argentene Hrysikos ("Hrysikos"), that he was being bullied at work. (*Id.* ¶ 50.) Hrysikos provided Logan with forms and referred him to the City's Equal Employment Opportunity ("EEO") office. (*Id.* ¶ 50.) Logan told an EEO representative that the bullying complaint was not an EEO matter, and the EEO office concluded that Logan's complaint did not fall under the City's EEO policy and recommended that Logan's department resolve the matter directly with him. (*Id.* ¶ 51.)

In December 2016, Logan requested a meeting with CDA's HR Division to discuss discrimination against African American officers, but Logan cancelled the meeting after he was informed that his pending grievance related to his suspension would not be discussed. (*Id.* ¶ 52.) Logan claimed that he declined to meet for fear of retaliation. (*Id.*) On December 30, 2016, Logan called the City's Office of the Inspector General to complain that the CDA was discriminating in disciplining its ASOs. (*Id.* ¶ 53.) In March 2017, after Logan was passed for a promotion, he amended his "workplace bullying" complaint to include the loss of a promotion due to his suspensions. (*Id.* ¶ 61.) In May 2017, Logan filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging retaliation and race, sex, and age discrimination. (*Id.* ¶ 63.)

Arbitration hearings regarding Logan's grievances based on his disciplinary charges occurred in August 2017 and September 2017. (*Id.* ¶¶ 64–65.) The result was reversal of the one-day suspension from the Travelers Aid incident and the overall reduction of Logan's suspension from 14 days to seven days. (*Id.* ¶¶ 64–67.) With respect to the 14-day suspension, the arbitrator found that all of the allegations against Logan were substantiated and that he was guilty of

"serious misconduct," including committing two deliberate falsifications of time sheets, and that "a heavy measure of discipline [was] warranted," especially given that Logan made "outrageous and unsupportable claims" at his hearing. (Zimmerman Arb. Op. at 29, 32, Ex. 8 to PSOF, Dkt. No. 78-8.) However, the arbitrator found that the City had also abused its discretion in meting out discipline, and found "overwhelming" evidence that Redding had a "personal vendetta" against Logan that caused Redding to initiate a "wide-ranging view of [Logan's] conduct, and to impermissibly interfere in the discipline process." (*Id.* at 33.) In October 2018, an arbitrator in a separate proceeding decided that Logan would have been promoted had he only had a seven-day suspension, and ordered the City to promote Logan, with back pay and benefits, effective March 2017. (PSOF ¶ 68.)

Logan brought this action in November 2017 and filed a ten-count Amended Complaint in March 2018. The Court granted partial dismissal. *See Logan v. City of Chicago*, No. 17-cv-8312, 2018 WL 5279304 (N.D. Ill. Oct. 24, 2018). At summary judgment Logan has four extant claims against the City of Chicago and five individual Defendants: Redding, Schmidt, Rodriguez, Bates, and May. Against the Defendant City, he alleges race and gender discrimination and retaliation under

Title VII of the Civil Rights Act and 42 U.S.C. § 2000e. He also alleges substantive and procedural due process violations under 42 U.S.C. § 1983 and brings municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). He also brings a claim under the Illinois Whistleblower Act, 740 Ill. Comp. Stat. § 174/1, against all Defendants. Finally, he claims the City of Chicago is obligated to indemnify the individual Defendants under 745 Ill. Comp. Stat. §§ 10/2-301, 2-302, 9-102. The Court will address each claim in turn.

## II. <u>LEGAL STANDARD</u>

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is "material" if it is one identified by the law as affecting the outcome of the case. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255).

### III.  **DISCUSSION**

#### A.  **Title VII Disparate Treatment Claims**

Title VII prohibits employment discrimination because of gender or race. 42 U.S.C. § 2000e-2(a)(1). At summary judgment, the question for the Court is whether "the evidence would permit a reasonable fact-finder to conclude" that Logan was "subjected to an adverse employment action based on a statutorily prohibited factor—here, race or sex." *McCurry v. Kenco Logistics Servs., Inc.*, 942 F.3d 783, 788 (7th Cir. 2019). The "sole question that matters" is if, all other circumstances being the same, Logan would have been promoted had he been a different race or gender. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016).

When, as here, there is no "smoking gun showing intentional discrimination," courts use the *McDonnell Douglas* burden-shifting framework to determine whether there are any triable issues. *LaRiviere v. Bd. of Trustees of S. Ill. Univ.*, 926 F.3d 356, 359-60 (7th Cir. 2019) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973)). Under this framework, Logan carries the burden of establishing a prima facie case of discrimination. *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 891-92 (7th Cir. 2016). If Logan makes this showing, the employer must produce evidence of a legitimate

nondiscriminatory reason for the employment action. Following that showing, the plaintiff must produce evidence showing that the employer's "stated reason is a pretext." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802–04).

To establish a prima facie case in a failure-to-promote case, Logan must put forth evidence that: (1) he is a member of a protected class; (2) he was qualified for the position sought; (3) he was rejected from the position; and (4) the employer promoted someone outside of the protected class who was not better qualified for the position. *Riley*, 829 F.3d at 892. The City only disputes Logan's showing of the second and fourth elements.

Logan cannot meet the second and fourth elements. He does not challenge the City's promotion eligibility rules, and only claims that the discipline that disqualified him was based on trumped-up charges by his supervisors. It is thus not in dispute that he was unqualified for the promotion. Further, in passing Logan over and promoting the next person on the PQC list, the City did not promote someone less qualified because the person promoted did not have Logan's disciplinary record. *See Rozulmalski v. W.F. Baird & Assocs., Ltd.*, 927 F.3d 919, 927 (7th Cir. 2019) ("[e]mployees must be similar in all material respects, including engaging in

- 15 -

identical or comparable misconduct, in order to reveal whether differential treatment is occurring.") (internal quotations omitted); *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 834 (7th Cir. 2005) (plaintiff had extensive disciplinary record, where promoted candidate did not).

It is undisputed that but for the discipline Logan would have been promoted, and Logan argues that an issue of material fact exists as to whether the disqualifying discipline was a pretext for retaliation. The heart of Logan's claim is that the individual Defendants meted out unfair discipline that was discriminatory and in retaliation for Logan's engagement in protected activity. That evidence, if true, goes to Logan's retaliation claim. In arguing that Logan was in fact qualified for the promotion and that the disciplinary infractions on his record were a pretext for discrimination, he tries to shoehorn a retaliation claim into a disparate treatment framework.

But even if Logan had established a prima facie case of discrimination, his claim would fail because no reasonable fact finder could determine that the City's reasons for disciplining him was a pretext for discrimination. To show pretext, Logan must demonstrate that: (1) the non-discriminatory reason for disciplining him was dishonest; and

(2) the true reason was based on a discriminatory intent. *Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 439 (7th Cir. 2014). None of the reasons for disciplining Logan were clearly dishonest—Redding had received complaints about Logan's behavior in the Travelers Aid and Airserv incidents and caught him on video not working when he represented he had. Logan also argues that the punishment he received for his offenses was too harsh. But even if that were true, there is not a scintilla of evidence in the record indicating any kind of animus based on race or gender. Accordingly, even assuming Logan made a prima facie case for discrimination, he cannot show pretext, and no reasonable jury could find in his favor on his Title VII claims.

Because he does not challenge the City's promotion system and does not dispute that, by the City's guidelines, he was ineligible for a promotion because of his disciplinary record, he cannot establish a prima facie case of Title VII discrimination against the City. No reasonable fact finder could determine that, on this record, he was qualified for the position or that the City promoted a less qualified candidate outside of Logan's protected class. Accordingly, summary judgment is appropriate for the City on Logan's Title VII claims.

## B. Retaliation

To succeed on a Title VII retaliation claim, Logan must show that: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between the two. *King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017). In his Amended Complaint, Logan claims he made an internal complaint of race discrimination to the City's HR Department and that, in retaliation, he did not receive a promotion. At summary judgment, Logan argues that his conversation with Redding in Redding's office about Audrey Diamond constitutes Title VII protected activity for which Redding and the other individual Defendants retaliated against Logan. Defendants acknowledge that Logan suffered an adverse employment action but dispute that he engaged in protected activity and that any causal connection existed between the supposedly protected activity and Logan's disciplinary infractions. The Court will first examine Logan's claim that he engaged in protected activity and then determine whether any reasonable fact finder could find a causal connection.

First, the Court will discuss Logan's internal HR and EEO complaints. The City concedes that Logan's communications with the HR department and his complaints of race

discrimination constituted protected activity. It also does not dispute that not being promoted was an adverse employment action. Logan does not dispute, however, that he was not promoted because of his disciplinary history. The disqualifying discipline occurred before he filed his HR complaints. Accordingly, there cannot be a causal connection, and his claim must fail on that point.

There is only one remaining action in the record that Logan engaged in prior to his suspensions that he argues is a protected activity: his conversation with Redding about Diamond, and the question remains whether a reasonable jury could conclude that the conversation constituted protected activity and that a causal connection existed between it and the promotion loss. Logan argues that a genuine dispute exists about his interactions with both Diamond and Redding, and so whether Logan engaged in Title VII protected activity is a jury question. To engage in Title VII protected activity, Logan must have complained with a "sincere and *reasonable* belief that he is opposing an unlawful practice." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (emphasis in original). That is, Logan must have subjectively believed he was opposing an unlawful practice, and that belief must have been objectively reasonable.

First, no reasonable jury could find that Logan sincerely believed he was opposing an unlawful practice. This is correct even taking as true Logan's telling of the events, which the Court must do at summary judgment. Logan admits that he went to Redding's office to discuss a personal matter, that he wanted to inform Redding that he was dating Diamond, and that Redding should follow "guy code" by not crossing a certain line. It is clear that Logan went to Redding's office to discuss his personal relationship with Diamond, not in the sincere belief that he was opposing an unlawful practice.

Further, even assuming Logan sincerely believed he was engaging in Title VII protected activity, this belief was not objectively reasonable. The "objective reasonableness of [Logan's] belief is not assessed by examining whether the [complained of] conduct was persistent or severe enough to be unlawful, but merely whether it falls into the category of conduct prohibited by the statute. *Id.* (citing *Magyar v. St. Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008)). Diamond's employer was U.S. Customs and Border Protection, not the City. Thus, she and Redding had different employers, and Redding was not her supervisor. Accordingly, Redding's alleged conduct was not prohibited by the Title VII statute, and Logan's belief that he was opposing an unlawful practice,

even if sincere, was not objectively reasonable. *See Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 928 (7th Cir. 2019) (defendant "can incur liability for sexual harassment only if [plaintiff] can prove the existence of an employer-employee relationship") (internal quotations omitted).

Even if Logan had engaged in protected activity in his conversation with Redding about Diamond, there is no evidence in the record that would allow a reasonable fact finder to conclude that the conversation caused retaliation. In his Amended Complaint, Logan alleges that the disciplinary charges brought against him were false or fabricated. The record belies that charge, and Logan does not dispute that he misrepresented the time that he worked on more than one occasion. In his summary judgment briefs, Logan pivots: he argues the real retaliation was that he was investigated at all, and that May recommended, and Redding imposed, such long suspensions. He also claims that Schmidt was wrong to check video footage because Schmidt did not regularly review video footage of other officers under his command. These arguments are meritless.

The only evidence in the record that could reasonably be interpreted as retaliatory or suggestive of animus behind an adverse employment action is the text message exchange

between May and Redding and the arbitrator's finding that Redding had a vendetta against Logan and instituted a wide-ranging investigation against him. Beyond that, there is nothing in the record indicating any kind of retaliatory intent. Even assuming Logan did engage in protected activity in confronting Redding about his interaction with Diamond, no reasonable jury could find a causal connection between that conversation and Logan's suspension.

Logan relies heavily on the arbitrators' findings that his suspensions were excessive, but the arbitrator also found that Logan had committed very serious infractions, including misrepresenting his work hours. And although an arbitrator reversed Logan's suspensions on the Travelers Aid and Airserv incidents, Redding received complaints about Logan's conduct in both cases. The evidence is overwhelming that Redding would have been on notice that Logan was committing repeated violations of workplace conduct rules and had, in fact, committed multiple infractions. Nothing indicates that Logan was investigated because of—or received discipline in retaliation for—engaging in any kind of protected activity, or for any other improper purpose.

Even though Redding may have been pursuing a personal vendetta against Logan, the Court finds that Logan did not

engage in any kind of protected activity. Even if he did, there is nothing indicating the reason Redding disliked Logan, and the Court cannot assume retaliation in the complete absence of evidence. Accordingly, not enough evidence of a causal connection with an adverse employment action exists for a reasonable jury to find in Logan's favor. The Court grants summary judgment to the Defendant City and the individual Defendants on Logan's retaliation claim.

### C. *Monell* and Due Process Claims

Logan's Amended Complaint includes claims for municipal liability under *Monell,* substantive and procedural due process and equal protection under 42 U.S.C. § 1983. Logan concedes in his briefing that the record does not support maintenance of these claims and agrees to voluntarily dismiss them. Accordingly, the Court grants summary judgment on Count VI of Logan's Amended Complaint.

### D. Illinois Whistleblower Act

Logan also brings a state law claim under the Illinois Whistleblower Act ("IWA"). The IWA prohibits retaliation "against an employee who discloses information" in a proceeding or to a government or law enforcement agency when the employee has "reasonable cause to believe that the information discloses a violation of a State or federal law,

rule, or regulation." 740 Ill. Comp. Stat. § 174/15. The Illinois Tort Immunity Act provides a one-year limitations period from the time "the interest at issue is invaded." *Taylor v. Bd. of Educ. of Chi.*, 10 N.E. 3d 383, 395 (Ill. App. Ct. 2014); *see also* 745 Ill. Comp. Stat. § 10/8-101(a) ("No civil action . . . may be commenced . . . unless it is commenced within one year from the date that the injury was received or the cause of action accrued.")

Defendants argue that Logan's IWA is time-barred. Logan responds that the continuous violation theory applies, making the one-year limitation inapplicable. Defendants insist that even if they committed tortious acts, they were discrete acts and not subject to the continuous violation doctrine. In the alternative, Logan argues that the failure to promote him occurred in March 2017, and because he filed suit in November 2017, he brought his IWA claim within a year. The Court addresses each response in turn.

Limitations periods begin "to run when facts exist that authorize one party to maintain an action against another." *Feltmeier v. Feltmeier*, 798 N.E. 2d 75, 85 (Ill. 2003). A continuing violation occurs "where the tort involves continuous or repeated injurious behavior, by the same actor and of a similar nature." *Taylor*, 10 N.E. 3d at 395. If the

continuing violation doctrine applies, a plaintiff's cause of action accrues on "the date the final injury occurs, or the tortious acts cease." *Id.* And, importantly, a continuing violation "is occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial violation." *Feltmeier*, 798 N.E. 2d at 85. In a discrete act, by contrast, "the statute begins to run on the date the defendant invaded the plaintiff's interest and inflicted injury, and this is so despite the continuing nature of the injury." *Id.* In both discrete act and continuous violation cases, the limitations period begins at the time of the tortious act. A continuous violation "does not involve tolling the statute of limitations because of delayed or continuing injuries." *Id.* at 86. Instead, the difference "involves viewing the defendant's conduct as a continuous whole for prescriptive purposes." *Id.*

Accordingly, Logan's IWA claim is time-barred either way. Logan concedes he is not challenging the City's promotional policy, and he does not dispute that his suspensions were the reason he was not promoted. He served his suspensions in September 2016 and filed his suit in November 2017. Thus, even if Logan experienced retaliation for engaging in protected activity, his claims would have

been time-barred, at the latest, in September 2017. Further, his alternative argument, that his IWA claim is timely because the City did not promote him in March 2017, fails because not receiving a promotion was clearly an effect of the allegedly tortious conduct and not the conduct itself. *See e.g., Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E. 2d 177 (Ill. 2002) (continuing violation rule did not apply where each tortious action, made two to four times per month, was separate violation supporting separate cause of action); *Bank of Ravenswood v. City of Chicago*, 717 N.E. 2d 478 (Ill. App. Ct. 1999) (city's construction of a subway tunnel under plaintiff's property did not constitute continuing trespass violation, and cause of action arose during the period of the subway's construction).

Even if his IWA claim for compensatory relief is time-barred, Logan argues he can demand equitable relief notwithstanding the statute of limitations. Defendants point to the arbitration awards reducing Logan's suspension and ordering the City to promote him with back pay and benefits, arguing that this moots Logan's claim for equitable relief. The Court agrees. Logan does not specify what additional equitable relief to which he believes himself entitled, and

the Court will not guess. Accordingly, Defendants are entitled to summary judgment on Logan's IWA claim.

### E.  Indemnification

Logan's Amended Complaint includes a count demanding the City of Chicago indemnify the individual Defendants pursuant to 745 Ill. Comp. Stat. §§ 10/2-301, 2-302, and 9-102. Defendants move for summary judgment on this claim if the Court grants summary judgment for the individual Defendants because there will be nothing to indemnify. As the Court has granted summary judgment for the individual Defendants on all claims, summary judgment on Count X of the Amended Complaint, the indemnification claim, is also appropriate.

### IV.  **CONCLUSION**

For the reasons stated herein, the Defendant City of Chicago's Motion for Summary Judgment (Dkt. No. 62) is granted. Defendants Jeffrey Redding's, Robert May's, Anthony Bates', David Schmidt's, and Jorge Rodriguez's Motion for Summary Judgment (Dkt. No. 64) is granted.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 3/25/2020